UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
MARVIN LILES,                      :
                                   :
                   Plaintiff,      :
                                   :
    -against-                      :    04 Civ. 7289 (THK)
                                   :
THE NEW YORK CITY DEPARTMENT OF    : **MEMORANDUM OPINION AND ORDER**
EDUCATION; JOEL I. KLEIN,          :
CHANCELLOR                         :
                                   :
                   Defendants.     :
----------------------------------X

**THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**

Plaintiff, Marvin Liles, a Caucasian male, 52 years old during the relevant time period, was employed as a Junior Reserve Officer Training Corps. ("JROTC") instructor at Port Richmond High School in Staten Island, New York ("Port Richmond"). He brings this action under the Age Discrimination in Employment Act of 1967, as amended 29 U.S.C. §§ 621-634 ("ADEA"), Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112-17 ("ADA"), and Comprehensive Omnibus Budget Reconciliation Act of 1986, 29 U.S.C. §§ 1161-1169 ("COBRA"), alleging employment discrimination based on age and disability, against the New York City Department of Education ("NYCDOE"), and the NYCDOE's Chancellor, Joel I. Klein ("Klein") (collectively, "Defendants").[1]

---

[1] In the Amended Complaint, Plaintiff also asserted a claim under the New York City Human Rights Law, Executive Law § 290, et seq. ("NYHRL"), and common law claims of defamation per se and negligence. In response to the summary judgment motion at issue here, Plaintiff agreed to "dismiss with prejudice all allegations brought under state law and state statute, including the state tort claim actions." (Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Response"), at 19.)

Presently before the Court is Defendants' Motion for Summary Judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Motion").  For the reasons set forth below, this Court grants Defendants' motion and dismisses this action with prejudice.[2]

**BACKGROUND**[3]

This action arises out of Plaintiff's employment as a JROTC teacher at Port Richmond.  Plaintiff commenced his employment with the NYCDOE (formerly the Board of Education) in 1993.  (See Deposition of Marvin Liles, dated Apr. 6, 2006 ("Liles Dep."), 45:11-13; Complaint ¶ 6.)  Plaintiff served as a JROTC instructor at Port Richmond from 1993 until he was terminated in 2003.  (See Liles Dep. 45:14-16; Complaint ¶ 13.)  Certification by the United States Army is required in order to teach JROTC.  (See Liles Dep.

---

[2] The parties consented to trial before this Court pursuant to 28 U.S.C. § 636(c).

[3] As set forth in greater detail below, Plaintiff failed to submit a proper Counterstatement of Disputed Material Facts, pursuant to Local Rule 56.1(b), instead submitting a document entitled "Local Rule 56.1 Statement of Undisputed Facts" ("Pl.'s SOF"), which not only fails to specifically counter Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Defs.' SOF"), but also largely fails to provide competent evidence - in the form of an affidavit or otherwise - to support the factual assertions contained therein.  Thus, to the extent that Plaintiff's allegations appear not to be in dispute, the Court will refer to the Complaint.  However, to the extent that facts are in dispute, the Court will look to the evidence submitted in connection with Defs.' SOF, which the Court deems admitted for purposes of the motion, as set forth in Section II, infra.  See Local Rule of the Southern District of New York ("L.R.") 56.1(c).

59:1-24; Deposition of Lisa Pollari, dated May 10, 2006 ("Pollari Dep."), 25:9-12.)

Plaintiff began working under Assistant Principal Lisa Pollari ("Pollari") in or around 2000 or 2001, and they had a good relationship for the first few years that she was his supervisor. (See Liles Dep. 99:11-17; 110:13-16.) In September of 2002, however, certain events transpired which led Plaintiff to believe that the school was discriminating against him on the basis of his age and disability. (Liles Dep. 110:21-111:12; Complaint ¶¶ 10-12; Pl.'s SOF ¶¶ 5-8.)

According to Plaintiff, he "was met with much turmoil from within the school administration" when he returned from summer vacation in September of 2002. (Complaint ¶ 9; see generally Liles Dep. 125-131.) Plaintiff alleges that Pollari's attitude toward him totally changed, that Pollari began making more regular visits to his classroom to observe, and that Pollari began interrupting his class to discuss the lessons he was giving. (Id.) Plaintiff does not provide dates or other specifics to support these allegations. (See generally id.) There were, however, specific disciplinary actions against Plaintiff that commenced during this time period.[4]

---

[4] The parties do not, of course, agree on the motivation behind the disciplinary actions - Plaintiff claiming that they were the product of discriminatory intent; Defendants claiming that they were the result of Plaintiff's wrongdoing and inappropriate behavior.  But the disciplinary actions themselves

<u>Class Coverage</u>

According to Plaintiff, in late October of 2002, he went to
see Pollari to let her know that he would be out later in the week
to attend a doctor's appointment.  (Liles Dep. 116:20-117:8.)
Allegedly unable to reach her, he nevertheless went to the doctor's
appointment and had one of his fellow JROTC instructors cover his
class. (<u>Id.</u>, 117:10-11.)   Plaintiff knew that Pollari had a policy
regarding class coverage, which included notifying her ahead of
time, but it was "not too clear" and, according to Plaintiff, was
not always followed.  (<u>Id.</u> 118:25-119:12.)  When Plaintiff returned
to school after his doctor's appointment, Pollari approached
Plaintiff to discuss her procedures regarding class coverage.  (<u>Id.</u>
116:13-18.)

On November 12, 2002, Pollari provided Plaintiff with a
letter, which he read, signed, and understood would be placed in
his personnel file.  (First Affidavit of Carolyn Walker-Diallo
("Diallo Aff. 1"), at Exhibit ("Ex.") G.)  The letter states that
Plaintiff approached Pollari on October 28, 2002 to notify her that
he had a doctor's appointment on Friday November 1, 2002, and that
he intended to "have another JROTC instructor 'cover' his class."
(<u>Id.</u>)  The letter further states that Pollari reminded Plaintiff of
the "school procedures and regulations regarding teacher absence
and class coverage," and explained to Plaintiff that he "needed to

_____
were well-documented and are generally not in dispute.

4

fill out the proper paper work." (Id.) As stated in the letter, in contravention of Pollari's instructions on October 28, 2002, Plaintiff had another JROTC instructor cover his class on November 1, 2002, without filling out the proper paper work. (Id.) The letter indicates that Plaintiff had adhered to school procedures and regulations regarding class coverage as recently as September 27, 2002. (Id.) In closing, the letter states that "[f]ailure to comply with school regulations in the future will result in further disciplinary action." (Id.)[5]

Threats And Inappropriate Language: First Incident

On November 2, 2002, two individuals submitted statements to the school administration regarding an event involving Plaintiff. In the first statement, from Plaintiff's United States Army JROTC supervisor, Major (Ret.) Stephen J. Torelli ("Major Torelli"), Major Torelli stated that on November 1, 2002, Plaintiff walked into a classroom and, in front of a handful of cadets, called Pollari a "racist" and started shouting, "I am going to fuck Pollari. I am going to fuck Pollari." (Diallo Aff. 1, Ex. E.) Major Torelli recommended that Plaintiff either apologize to the

---

[5] Tellingly, Plaintiff does not dispute the factual assertions in the letter. Instead he cryptically claims – with no supporting evidence – that Pollari's actions against Plaintiff were the result of age-based discrimination. (Response at 14 ("If not for defendant's motive to terminate its elder workforce, and stop allowing Plaintiff from taking days off to tend to his physician's appointments, which invariably come with old age[,] Plaintiff would not have been fired.").)

cadet battalion and Social Studies Department, or not be allowed to work with Port Richmond students.  (Id.)  A cadet at the school also submitted a statement on November 2, 2002, in which he or she (the name of the cadet has been redacted) indicated that "when [Plaintiff] walked in" he said "I am going to kill that bitch (Mrs. Pollari)."  (Diallo Aff. 1, Ex. F.)

The Principal of Port Richmond, Robert J. Graham ("Graham"), received a copy of Major Torelli's statement on December 3, 2002, and met with Plaintiff to discuss Major Torelli's statement on December 4, 2002. (Diallo Aff. 1, Ex. I.)  In a letter from Graham to Plaintiff, dated December 12, 2002, which Plaintiff read, signed, and understood would be placed in his personnel file, Graham summarized the December meeting.  The letter indicates that when Graham confronted Plaintiff about Major Torelli's statement, Plaintiff stated "'I'm not gonna comment on that'" and "'It didn't go down like that.'"  (Id.)  The letter also states that Graham interviewed two other cadets, both of whom recalled the incident and stated that Plaintiff had used foul language in referring to Pollari.  (Id.)  The letter closes by warning Plaintiff that if there were any "similar incidents in the future, [he would] be subject to further disciplinary action, including an unsatisfactory rating for the year."  (Id.)[6]

---

[6] Plaintiff makes no mention of this alleged incident, the statements that were submitted in connection therewith, or of Graham's December 12, 2002 letter, in either his Response or

Supervision Of Cadets

     On December 13, 2002, Major Torelli submitted another letter to the Port Richmond administration regarding Plaintiff. (Diallo Aff. 1, Ex. J.)   In the letter, Major Torelli claimed that Plaintiff "disregarded the Board of Education policy" regarding trip forms on picture day, a violation, Major Torelli claimed, that led to many cadets "roaming the building." (Id.) The letter closes by stating that, in Major Torelli's view, Plaintiff "continues to rebel against Cadet Command and Port Richmond School Policy." (Id.)[7]

Threats And Inappropriate Language: Second Incident

     On December 17, 2002, one of Plaintiff's colleagues and fellow JROTC instructors at the school, Tony Baker (SFC) Ret. ("Baker"), submitted  a "Staff Statement Form" regarding another incident involving Plaintiff. (Diallo Aff. 1, Ex. K.)   In Baker's statement, he described an incident that took place on December 16, 2002, at approximately 8:20 a.m., where Plaintiff expressed his opinion that Pollari was trying to get him fired, and stated: "'I swear to God, if she is trying to get me fired, I'm going to kill

---

Statement of Facts.

    [7]  Plaintiff again makes no mention of this alleged incident, or of Major Torelli's December 13, 2002 letter, in either his Response or Statement of Facts.

her, Bob and Major Torelli." (<u>Id.</u>)[8]  Baker's statement also asserted that Plaintiff said "You know what I am going through. I'm on all this medication and I don't have nothing to lose." (<u>Id.</u>)  Baker claimed that later in the day he went to speak to Graham to discuss this incident, but because he was concerned about Liles' emotional well-being, he did not tell Graham everything that was said. (<u>Id.</u>)  Baker stated that when he got home that evening, he received a call from Pollari, who asked him if he had told Graham everything. (<u>Id.</u>)  When Baker stated that he had not, Pollari told him that it was his duty to tell Graham everything that had been said. (<u>Id.</u>)  Baker then called Graham and told him about the entire incident, including Plaintiff's death threat. (<u>Id.</u>)

Upon hearing of this incident, Major Torelli sent an e-mail to a Lieutenant Campbell, on December 17, 2002, with the "Subject: Serious Incident," in which he set forth Plaintiff's alleged threat. (Diallo Aff. 1, Ex. M.)  The next day, December 18, 2002, Major Joel P. Brown, 2nd Brigade JROTC Operations Officer, issued a document entitled "Serious Incident Report Worksheet," in which the Army recorded Plaintiff's alleged death threats against Pollari, Graham, and Major Torelli, and noted that the school

---

[8] During his deposition, Plaintiff admitted that he made these statements to Sergeant Baker, but claimed that he did so "in confidence" and "as a pastor of [Plaintiff's] faith." (Liles Dep. 154:25, 162:25-163:11.)

intended to meet with Plaintiff the following day.  (Id.)

On January 2, 2003, Pollari prepared a letter, which Plaintiff read, signed, and understood was going to be placed in his personnel file, in which she stated that she and Graham met with Plaintiff and his "UFT representative," on December 17, 2002, to discuss Plaintiff's alleged death threat against Pollari, Graham, and Major Torelli.  (Diallo Aff. 1, Ex. N.)  The letter states that Plaintiff admitted to being angry and saying some things, "in the heat of the moment," that he could not recall.  (Id.)[9]

The letter also summarizes another meeting attended by Plaintiff, Pollari, Graham, Major Torelli, and Major Brown (who was sent by Colonel Cianchetti at Second Brigade), on December 20, 2002.  At that meeting, the administration discussed with Plaintiff the recent disciplinary actions that it had taken against him and stated that each of the following were discussed in detail: (1) "Lack of attention to school procedures," (2) "Inappropriate language in the presence of cadets," (3) "Hostility toward supervisory staff," and (4) "Insufficient supervision of cadets in [Plaintiff's] charge."  (Id.)  The letter provides three recommendations and states that the "[f]ailure to adhere to the above stated recommendations will lead to further disciplinary

---

[9] At his deposition, Plaintiff admitted threatening to kill Pollari, Graham, and Major Torelli, but testified that he made the statements to Baker in confidence and "as a pastor of my faith."  (Liles Dep. 154:4-9; 162:22-163:11.)

action including an unsatisfactory rating for the year. Be advised that an unsatisfactory rating for an uncertified teacher will result in termination." (Id.)

Intent To Withdraw Junior ROTC Certification

On January 2, 2003, Colonel Carlos Glover also advised Plaintiff by letter that, based on (1) the death threats against members of the administration, (2) failure to follow "Cadet Command Regulation," and (3) failure to display "the ability to function well as an instructor in Junior ROTC and within the school system," the Army intended to withdraw Plaintiff's Junior ROTC Certification, and that withdrawing certification would prevent Plaintiff from being employed as an Army instructor. (Diallo Aff. 1, Ex. O.)

Punishment of Cadets

Approximately one month later, while chaperoning cadets during a drill meet at Francis Lewis High School, Plaintiff punished two cadets for leaving their post by having them stick their heads in a garbage can. (Liles Dep. 149:11-151:10.) In connection with this incident, Graham filed a "Corporal Punishment Reporting Form" with the NYCDOE on behalf of the two cadet victims.[10] (Diallo Aff. 1, Ex. Q.) Graham also appears to have prepared an "Alleged Corporal Punishment Incident Report," dated February 25, 2003, in

---

[10] The report itself does not have a date, but the facsimile transmission line indicates that it was faxed from the Port Richmond school on February 24, 2003.

which he found the allegations of corporal punishment to be "substantiated," and indicated that the Office or Appeals and Review had been contacted.  (Diallo Aff. 1, Ex. T.)  On February 12, 2003, the two cadets who were ordered to stick their heads in a garbage can both submitted statements indicating that they believed the punishment to be a joke and did not believe it was necessary for the school to write up Plaintiff regarding the incident.  (Verification of Peter J. Cresci ("Cresci Ver."), Ex. Y.)

NYCDOE Regulation A-420 defines corporal punishment "as any act of physical force upon a pupil for the purpose of punishing that pupil."  (Cresci Ver., Ex. N.)  Regulation A-420 also references the Bylaws of the City Department of Education, which state, in pertinent part:

> NO CORPORAL PUNISHMENT SHALL BE INFLICTED IN ANY OF THE PUBLIC SCHOOLS, NOR PUNISHMENT OF ANY KIND TENDING TO CAUSE EXCESSIVE FEAR OR PHYSICAL OR MENTAL DISTRESS.  VIOLATION OF THIS BYLAW SHALL CONSTITUTE GROUNDS FOR DISMISSAL.

(Id. at 2.)

Plaintiff testified that, sometime in the middle of February, 2003, he met with Colonel Chianchetti, Commander of the Second Brigade, and that the purpose of that meeting was "basically" to fire Plaintiff.  (Liles Dep. 184:24-185:5.)  During the same meeting, Chinchetti advised Plaintiff that he was going to be decertified at the end of the month and that Plaintiff "should seek

other employment." (Id. 185:5-22.)

On February 26, 2003, Graham wrote another letter to
Plaintiff, which Plaintiff read, signed, and understood would be
placed in his personnel file. (Diallo Aff. 1, Ex. U.) In the
letter, Graham summarized a meeting attended by Pollari, Colonel
Chinchetti, Major Brown, and Major Torelli, which related to the
February 8, 2003 incident involving the cadets. (Id.) The letter
states that when confronted with the allegations regarding the
incident, Plaintiff responded "it was a stupid thing to do." (Id.)
The letter states in closing that Plaintiff's "actions in this
incident may lead to further disciplinary action including an
unsatisfactory rating and termination." (Id.)

Decertification and Termination

By letter dated February 26, 2003, Colonel Glover formally
advised Plaintiff that, based on his admissions that he (1) made
death threats against school administrators, and (2) forced two
cadets to stick their heads in a garbage can, the Army had
determined that Plaintiff's conduct went "against good order and
discipline," and that the Army was withdrawing Plaintiff's
authorization to serve as a JROTC instructor, effective February
28, 2003. (Diallo Aff. 1, Ex. V.) The letter also states, in
bold: "Accordingly, effective 28 February 2003, you are no longer
authorized to serve as a Junior ROTC instructor or to associate
officially in any manner with the Army Junior ROTC Program." (Id.)

12

Thereafter, Graham filled out a form entitled "Annual Professional Performance Review And Report On Probationary Service Of Pedagogical Employee" ("Report"), and gave Plaintiff a "U" (Unsatisfactory) Rating. (Diallo Aff. 1, Ex. W.)[11] Graham sent the Report to Plaintiff on March 25, 2003. (Cresci Ver., Ex. M.)

Plaintiff claims that, on March 6, 2003, he was "totally humiliated" when he was escorted off school premises by a security guard. (Cresci Ver., Ex. E (Plaintiff's Responses to Defendant's First Set of Interrogatories), at 8.) Plaintiff was asked to remove all of his personal items from the school and was required to turn in the keys to his office and his desk. (See id. at 8-9; Liles Dep. 188:19-22.) Every item Plaintiff removed from the school "was itemized, counted, inventoried and labeled." (Cresci Ver., Ex. E at 9.)

On March 10, 2003, Lawrence Becker, Chief Administrator, Division of Human Resources at the NYCDOE, sent Plaintiff a letter advising him that he had "been placed on the New York City Department of Education's Ineligible/Inquiry List." (Diallo Aff. 1, Ex. Y.) The middle of the letter states in bold and all capitals: "THREATENING BEHAVIOR." (Id.)

On March 12, 2003, Graham sent a letter to Virginia Caputo,

_____

[11] The date that Graham filled out this form is unclear. Although Graham signed and dated it February 28, 2003, the Report contains references to at least one document prepared weeks later. (See Diallo Aff. 1, Ex. W at 2 (referencing "3/17/03 Letter from Mr. Reyes Irizarry, BASIS Supt.").)

Division of Human Resources, Office of Appeals and Reviews at the NYCDOE, to "recommend the termination" of Plaintiff. (Diallo Aff. 1, Ex. Z.) Graham stated that Plaintiff's "Army Cadet Command was apprised of his conduct and rendered a decision (see attached) to decertify him as a Junior ROTC instructor effective February 28, 2003." (Id.) Graham also stated, "In view of this action I recommend that he be terminated by the NYC Department of Education." (Id.)[12]

On March 17, 2003, Reyes Irizarry, Superintendent, District 76, wrote Plaintiff an official termination letter. (Diallo Aff. 1, Ex. AA.) In the letter, Superintendent Irizarry stated:

> Your principal has informed me that he is rating you "Unsatisfactory" based on your having committed corporal punishment thus violating Chancellor's Regulation A 420, your having been decertified as an instructor of JrROTC, and your having threatened to kill your assistant principal, Graham and your Major. After a review of the circumstances surrounding this rating, I have determined that you be terminated from service and your JrROTC certificates be revoked, effective immediately.

(Id.)

Post-Termination

On March 26, 2003, Alina Cocozza ("Cocozza"), Payroll Secretary at Port Richmond, sent Plaintiff a letter, enclosing a COBRA form and advising Plaintiff that his health insurance was

_____

[12] Defendants submitted this letter without the attachment it references.

terminated as of March 14, 2003.  (Diallo Aff. 1, Ex. BB.)
Although Plaintiff produced the March 26, 2003 letter in the course
of pretrial discovery, he testified that he does not recall
receiving it, as he was in the hospital at the end of March, 2003.
(Liles Dep. 193:1-194:17.) He also admitted, however, that his wife
was handling the mail during this time and that when he and his
wife are both out, the neighbors collect his mail for them. (Id.)
On August 22, 2003, the NYCDOE also sent COBRA forms to Plaintiff's
attorney, which Plaintiff's attorney then forwarded to Plaintiff.
(Cresci Ver., Ex. I.)

Plaintiff filed a Charge of Discrimination with the Equal
Employment Opportunity Commission ("EEOC") on January 9, 2004.
(Cresci Ver., Ex. C; Diallo Aff. 1, Ex. DD.)  The EEOC sent
Plaintiff a Dismissal and Notice of Rights on June 10, 2004.
(Diallo Aff. 1, Ex. EE.)  On August 2, 2004, Carmen Farina, Acting
Deputy Chancellor, Teaching and Learning (as designee for Joel I.
Klein, Chancellor), sent Plaintiff a letter notifying him that, in
connection her committee's recommendation that Plaintiff's
"teaching certificate(s)/license(s) be terminated effective March
17, 2003," and Plaintiff's "appeal of [his] 'Unsatisfactory'
rating," she had made a determination to sustain the Unsatisfactory
rating based on Plaintiff's conduct.  (Cresci Ver., Ex. CC.)

On September 13, 2004, Plaintiff filed the instant action.
Plaintiff claims that Defendants unlawfully discriminated against

15

him based on his age and disability.  Plaintiff also claims a violation of COBRA for failure to provide Plaintiff with proper notification of COBRA benefits following his termination.

**DISCUSSION**

I.   <u>Summary Judgment Standards</u>

    A.   <u>Federal Rule 56</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried, and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986); <u>Salahuddin v. Goord</u>, 467 F.3d 263, 272-73 (2d Cir. 2006); <u>Williams v. Utica College of Syracuse Univ.</u>, 453 F.3d 112, 116 (2d Cir. 2006).  The burden of demonstrating the absence of any genuine dispute as to material facts rests upon the party seeking summary judgment. <u>See</u> <u>Adickes v. S. H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970).  Once a properly supported motion for summary judgment has been made, the burden shifts to the nonmoving party to make a sufficient showing to establish the essential elements of that party's case on which it bears the burden of proof at trial.  <u>Hayut v. State Univ. of N.Y.</u>, 352 F.3d 733, 743 (2d Cir. 2003).  The nonmoving party must put forth "specific facts showing there is a genuine issue for trial." Fed.

16

R. Civ. P. 56(e).  In assessing the record to determine whether there is a genuine issue to be tried as to any material fact, courts are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

When a case is fact-intensive and turns on the intent of one party, as employment discrimination cases often do, "trial courts must be especially chary in handing out summary judgment." Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996); accord Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000), cert. denied, 530 U.S. 1261, 120 S. Ct. 2718 (2000).  The trial court is under a duty in such cases to carefully scrutinize the record for circumstantial evidence that could support an inference of discrimination. See Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).  Nevertheless, even in discrimination cases, "conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56(e)." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); accord Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997).  The "salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases" than to other types

17

of cases. <u>Meiri</u>, 759 F.2d at 998; <u>see also</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."), <u>cert. denied</u>, 534 U.S. 993, 122 S. Ct. 460 (2001).

      B.   <u>Local Rule 56.1</u>

A party moving for summary judgment must submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule of the Southern District of New York ("L.R.") 56.1(a). A party opposing the motion for summary judgment must include in its papers "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing . . . additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). Significantly, "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party *will be deemed to be admitted* for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c)(emphasis added). Finally, all statements by the moving and non-moving party must be "followed by citation to evidence which would be admissible" under

Federal Rule of Civil Procedure 56(e).  L.R. 56.1(d).

     Consequently, under Local Rule 56. 1(b), the non-moving party "may not rest upon the mere allegations or denials of [his] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Dunkin Donuts, Inc. v. Barr Donut, LLC, 242 F. Supp. 2d 296, 298 (S.D.N.Y. 2003) (quoting Sterbenz v. Attina, 205 F. Supp. 2d 65, 67 (E.D.N.Y. 2002). A non-moving party's failure to adhere to Local Rule 56.1(b) can prove fatal because "[c]ourts in this circuit have not hesitated to deem admitted the facts in a movant's Local Rule 56.1 Statement that have not been controverted by a Local Rule 56.1 statement from the non-moving party." Gadsden v. Jones Lang LaSalle Americas, Inc., 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002) (collecting cases); see also Millus v. D'Angelo, 224 F.3d 137, 138 (2d Cir. 2000) (summary judgment "appropriate" in light of non-moving party's failure to comply with Local Rule 56.1(b)); Dunkin Donuts Inc., 242 F. Supp. at 298 (facts deemed admitted because non-moving party did not submit a proper counter-statement of facts and did not include citations to evidence in the statement it did submit). Nevertheless, Local Rule 56.1 "does not absolve the party seeking summary judgment of the burden of showing that it is entitled to judgment as a matter of law, and a Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported by the record." Holtz v. Rockefeller & Co., Inc., 258

F.3d 62, 74 (2d Cir. 2001); <u>see also</u> <u>Giannullo v. City of New York</u>, 322 F.3d 139, 140 (2d Cir. 2003) (same).

II.   <u>Plaintiff's Failure To Comply With Local Rule 56.1</u>

Plaintiff clearly failed to adhere to the requirements of Local Rule 56.1. Defendants, as the moving parties, properly submitted a separate statement of facts under Local Rule 56.1(a), which contains concise recitations of forty-six (46) facts Defendants believe are undisputed and which are, for the most part, properly supported by citations to admissible evidence, pursuant to Local Rule 56.1(d). It was then incumbent on Plaintiff, as the non-moving party, to submit in its papers "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Plaintiff failed to do so, instead submitting his own statement of fifteen (15) allegedly undisputed facts, which does not dispute any of Defendants' factual assertions. Plaintiff's submission is, therefore, in clear violation of Local Rule 56.1(b). <u>See, e.g.</u>, <u>Millus v. D'Angelo</u>, 224 F.3d at 138. Moreover, Plaintiff fails to provide citations to admissible evidence for the facts he claims are undisputed, as required by Local Rule 56.1(d). Instead of submitting such evidence, Plaintiff improperly cites to the allegations of his Complaint (<u>see, e.g.</u>, Pl.'s SOF ¶¶ 1, 3-5, 7, 10, 11, 15) or, more egregiously, provides no citation at all for some of his factual assertions. (<u>See, e.g.</u>, <u>id.</u> ¶¶ 1-2, 4-14.) Thus, Plaintiff's

submission is, again, in clear violation of the Local Rule.  See Dunkin Donuts, 242 F. Supp. 2d at 298 (non-moving party "may not rest upon the mere allegations or denials of [his] pleading").

In light of these patent failures, the Court will deem as admitted Defendants' facts, to the extent that they are supported by accurate citations to admissible evidence.  As discussed below, certain of these facts present insurmountable obstacles to the viability of Plaintiff's claims.

III. Statute of Limitations

Defendants argue that Plaintiff's discrimination claims under the ADA and ADEA are time-barred because Plaintiff did not file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory acts.  (Defendants' Memorandum of Law In Support of Their Motion for Summary Judgment ("Defs.' Mem."), at 3-5.)  The Court agrees that the discrimination claims are time-barred.

A.  Legal Standard

In order to file a federal lawsuit under the ADA or the ADEA, a plaintiff must file a charge of discrimination with the EEOC within three hundred (300) days after the date of the alleged unlawful acts.  See 29 U.S.C. § 626(d); 42 U.S.C. § 2000e-5(e)(1); Harris v. City of New York, 186 F.3d 243, 247-48 (2d Cir. 1999). In a well-established line of cases, the Supreme Court has consistently held that "the EEOC charging period is triggered when

a discrete unlawful practice takes place." <u>Ledbetter v. Goodyear Tire & Rubber Co., Inc.</u>, -- U.S. --, 127 S. Ct. 2162, 2169 (2007); <u>see also</u> <u>Nat'l Railroad Passenger Corp. v. Morgan</u>, 536 U.S. 101, 110-11, 122 S. Ct. 2061 (2002) (plaintiff "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period"); <u>Lorance v. AT&T Technologies, Inc.</u>, 490 U.S. 900, 911, 109 S. Ct. 2261 (1989) ("[I]t is the date of [the alleged illegality] which governs the limitations period."); <u>Delaware State College v. Ricks</u>, 449 U.S. 250, 258, 101 S. Ct. 498 (1980) (insufficient to allege that termination gives present effect to the past illegal act); <u>United Airlines v. Evans</u>, 431 U.S. 553, 557, 97 S. Ct. 1885 (1977) ("[A] discriminatory act which is not made the basis for a timely charge . . . is merely an unfortunate event in history which has no present legal consequences.")

Consequently, "a new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination." <u>Ledbetter</u>, 127 S. Ct. at 2169.  In other words, the "proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts become most painful." <u>Delaware State College</u>, 449 U.S. at 258 (emphasis in original) (quoting <u>Abramson v. Univ. of Hawaii</u>, 594 F.2d 202, 209 (9th Cir. 1979)); <u>see also</u> <u>Pearson v. Bd. of Educ.</u>, No. 02 Civ. 3629 (DC), 2007 WL 2296453 at *12 (Aug. 10, 2007

S.D.N.Y.) ("[T]he 300 day period starts to run when the claimant receives notice of the allegedly discriminatory conduct, not when the allegedly discriminatory decision takes effect.") In all events, "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." Delaware State College, 449 U.S. at 257, 101 S. Ct. at 504.

    B.   Application

     Plaintiff filed his charge of discrimination with the EEOC on January 9, 2004. (Diallo Aff. 1, Ex. DD.)  March 15, 2003 is 300 days prior to January 9, 2004.  Thus, Plaintiff is precluded from seeking relief in connection with alleged discriminatory acts that occurred prior to March 15, 2003.  Defendants argue that Plaintiff's discrimination claims under the ADA and ADEA are time-barred because they relate to his termination which, in Defendants' view, took place, "as early as February 28, 2003 [when Plaintiff was decertified by the Army and given a "U" rating by the school] and no later than March 10, 2003, [when] plaintiff was informed that his services with the DOE were no longer desired." (Defs.' Mem., at 3-4.)  Plaintiff argues that he was "terminated by letter, dated March 17, 2003," and that is the date of the "unlawful employment event from which Plaintiff complained." (Response, at 9-10.)  The dispute between the parties, therefore, is centered on

the effective date of Plaintiff's termination.[13]

Although Plaintiff's specific arguments are at times difficult to discern, based on all of the materials he presented to the Court, the Court believes the following to be a fair reading of Plaintiff's claims: when Plaintiff returned to school after summer break in 2002, PRHS began to discriminate against Plaintiff, based on his age and disability, by grossly exaggerating a series of incidents involving Plaintiff, and then communicating a distorted version of the events to the Army, with the ultimate goal of having the Army decertify Plaintiff as a JROTC teacher, which would inevitably lead to his termination from the school. This reading of Plaintiff's claims is compelled by Plaintiff's testimony, material facts that are not in dispute, the allegations of his Complaint, and arguments in his Response.

Specifically, Plaintiff testified that, upon his return to school after summer vacation in September 2002, Pollari's attitude towards him "totally changed," and that "she became a very hostile person to [him] in a lot of ways." (Liles Dep. 152:11-20; see also Pl.'s SOF, ¶ 5 ("In September of 2002, . . . Plaintiff was met with much turmoil from within the school administration"; Complaint, ¶ 9 (same).) Among other things, Pollari began to do more regular observations of Plaintiff's classroom (Liles Dep. 125:19-25),

_____

[13] Plaintiff does not dispute that the alleged discrimination relating to the warnings and writeups he received is time-barred.

interrupt Plaintiff while he was giving his lessons (id. 129:5-12), and otherwise treat Plaintiff differently than she treated other JROTC instructors. (See generally id. at 125-131.) When asked whether he thought he was being singled out because of his age, Plaintiff responded "[p]ossibly." (Id. 130:16-17; see also 202:17-203:22.)[14]

With respect to his contention that PRHS discriminated against him on the basis of disability, Plaintiff's claims are less clear. Plaintiff testified that he believed Pollari's motivation for writing him up for failing to follow class coverage procedures in October of 2002 was that "she knew I was sick." (Liles Dep. 208:8-9.) Although Plaintiff testified that he did not notify anyone at PRHS that he may have had cancer, until November of 2002, he testified that Pollari knew he was "sick a lot" as of October of 2002. (Id. 208:18-209:6.) In his arguments to the Court, Plaintiff confirms that he believed that the administration's scrutiny of his class coverage protocol was the result of discrimination based on his disability, because he argues in his Response that when Pollari became aware of his disability, she

---

[14] Elsewhere, Plaintiff affirmatively alleges that "Port Richmond intentionally discriminated against plaintiff Marvin S. Liles based on age," and that when he returned to school in September of 2002, he was "met with much turmoil from within the school administration," "began to experience problems" with Graham, Pollari and Major Torelli, and that the administration started to "find fault in [him] . . . after previously commending him for his abilities." (Pl.'s SOF ¶ 5; Complaint ¶ 9.)

"became enraged and advised that the JRROTC [sic] Instructors could not 'cover' each other's classes." (Response, at 11; <u>see also</u> Response, at 7 ("Pollari also knew that Plaintiff had been going to the doctors on numerous occasions in October, 2002 - as this was Ms. Pollari's reason for changing the terms and conditions of Plaintiff's employment by not being able to have another JROTC instructor cover their class.").)[15]  Plaintiff also testified that his direct supervisor within the JROTC program, Major Torelli, discriminated against him based on age and disability when he left a derogatory note about Plaintiff on his computer, in December of 2002.  (Liles Dep. 209:10-22.)

Thus, based on Plaintiff's testimony and arguments to this Court, Plaintiff contends that he was the victim of age-based discriminatory acts as early as September of 2002, and disability-based discriminatory acts as early as October or November of 2002. From those dates forward, Plaintiff rarely delineates whether the alleged discriminatory acts against him were rooted in age discrimination or disability discrimination, but he testified generally about numerous incidents that continued through February 2003, which he believes were the product of discriminatory intent.

On December 17, 2002, Plaintiff claims that the administration

---

[15] The fact that there is little, if any, evidentiary support for this claim will be addressed elsewhere.  Plaintiff's arguments are cited here merely to show that he believes he was being discriminated against on the basis of his disability as early as October or November of 2002.

exaggerated the death threats he admits making against AP Pollari, Graham, and Major Torelli, and communicated those exaggerated threats to the Army, in an effort to "demean [his] character and credibility." (Pl.'s SOF, ¶ 8.)[16]  Based on these death threats, the Army submitted a Serious Incident Report ("SIR"), on December 18, 2002, and, on January 2, 2002, the Army notified Plaintiff that, based on, among other things, the death threats, it intended to withdraw his JROTC Certification and that without certification, he could not "be employed as an Army Instructor." (Diallo Aff. 1, Ex. M.)

On February 8, 2002, Plaintiff disciplined students by making them stick their heads in a garbage can. (Liles Dep. 149:23-152:5.) Plaintiff argues that, following this incident, "[i]n another effort to insure [his] removal, Mr. Torelli and Ms. Pollari created a maelstrom to insure this incident would sully Plaintiff's previously solid record as a JROTC instructor." (Response, at 16.) Graham wrote to Colonel Chianchetti to express concern over this latest incident, on February 14, 2003. (Diallo Aff. 1, Ex. R.) Thereafter, Chianchetti came to speak to Plaintiff in the middle of February to "basically" fire Plaintiff, and to notify

---

[16] Plaintiff ignores the fact that Major Torelli observed and reported the incidents, not the school administrators he sued for discrimination.  Moreover, Plaintiff does not address many of the other disciplinary incidents that took place.  For example, he does not discuss the report that he used profanity to describe AP Pollari in front of students, on November 6, 2002, or that he failed to adequately supervise students on December 13, 2002.

Plaintiff that he was going to be decertified at the end of the month, and that he "should seek other employment." (Liles Dep. 184:24-185:22.)

By letter dated February 26, 2003, Plaintiff was officially decertified as a JROTC instructor, effective February 28, 2003. (Diallo Aff. 1, Ex. V.) The letter stated in bold, "you are no longer authorized to serve as a Junior ROTC instructor or to associate officially in any manner with the Army Junior ROTC program." (Id.) Plaintiff then received a "U" Rating from PRHS on February 28, 2003 (Diallo Aff. 1, Ex. W), and was asked to turn in his keys, remove his belongings and leave the school, on March 5, 2003 (Cresci Ver. , Ex. E at 5); he was placed on the NYCDOE's ineligible list on March 10, 2003 (Diallo Aff. 1, Ex. Y), and was formally terminated by letter dated March 17, 2003 (Cresci Ver. , Ex. D). Thus, the only adverse act Plaintiff complains of that occurred within the limitations period was his formal termination letter of March 17, 2003.[17]

---

[17] It is unclear whether Plaintiff could have shown that each of the letters that were placed in his file were, in and of themselves, adverse employment actions that would have given rise to a cause of action. See Sanders v. New York City Human Resources Admin., 361 F.3d 749, 756 (2d Cir. 2004) ("negative job evaluation may constitute adverse employment action"); but see Weeks v. New York State (Div. Of Parole), 273 F.3d 76, 86 (2d Cir. 2001) (notice of discipline and counseling memo insufficient to constitute adverse employment action). The Court, however, will not engage in that analysis because Plaintiff does not seek relief upon acts prior to his termination and, in all events, claims based on acts occurring prior to March 15, 2003 are clearly time-barred.

In what the Court believes to be a critical admission of fact, Plaintiff testified that in order to be a JROTC instructor, he first needed to be selected by the Army, and if the Army did not select him, he could not have gotten the position. (Liles Dep. 59:3-13.)  Plaintiff also never disputes – in his deposition testimony, SOF, or Response – and, therefore, admits, Defendants' assertion, which is supported with evidence and which the Court deems admitted for purposes of this motion, that "[t]o be a Junior ROTC instructor in the DOE's schools, an individual must be certified by the United States Army." (Defs.' SOF ¶ 3; see also id. ¶ 33.)  Likewise, the Court deems admitted Defendants' factual assertion that the "Army's decertification of the position rendered Plaintiff unqualified for the Junior ROTC position at PRHS." (Id. ¶ 34.)  Thus, in light of all the information before the Court, it seems an inescapable conclusion that once the Army decertified Plaintiff, he knew that he could not continue on in his employment at Port Richmond.

Plaintiff confirms this understanding in his Response, where he crystallizes his view of the alleged wrongdoing in this case by stating as follows:

> These false reasons are the crux of Plaintiff's removal from employment.  No one believes for a second that the actions of the U.S. Army were separate and distinct from that of the Defendant (Plaintiff had been receiving excellent evaluations).  Defendant found a way to get Plaintiff decertified - and that was by feeding U.S. Army officials with negative and

29

> detrimental information, suggestively hyping
> the worst of Plaintiff's actions in order to
> achieve their goal, i.e. termination."

(Response, at 17)(internal citations omitted).

In light of the foregoing, Plaintiff's discrimination claims in this case are time-barred. The discriminatory act Plaintiff alleges in this case is that the school terminated him based on his age and disability. But that argument fails to appreciate that once Plaintiff was decertified by the Army, his termination was a foregone conclusion; indeed, it was required. Thus, under well-established Supreme Court precedent, the charging period started to run either (a) when the Army decertified Plaintiff (orally in the middle of February, or, formally on February 26, 2003), or, alternatively, and at the latest, (b) when, following the decertification, school authorities required Plaintiff to remove all of his personal items and escorted Plaintiff off school premises, on March 5, 2003.[18] The charging period did not start to run, as Plaintiff claims, when he received the March 17, 2003 formal termination notice. See Economu v. Borg-Warner Corp., 829 F.2d 311, 315-16 (2d Cir. 1987) (limitations period began to run

---

[18] Plaintiff's deposition testimony appears to indicate that, as of late February, he knew that he had lost his job. When asked during his deposition whether he consulted with his attorney after he was terminated, he stated that he did not do so because he had to go in for surgery on February 28. (See Liles Dep. 188:3-8.) Thus, Plaintiff appears to be saying that he knew he was terminated before he went into the hospital, but could not speak to his attorney about it at that time.

when plaintiff's attorney was notified orally that plaintiff would be terminated, not on actual date of involuntary termination two weeks later); Dillman v. Combustion Eng'g, Inc., 784 F.2d 57, 59 (2d Cir. 1986) (the limitations period "begins on the date employee receives notice of his discharge, not necessarily on the date of termination"); Miller v. Int'l Tel. & Telegraph. Corp., 755 F.2d 20, 24 (2d Cir. 1985) (limitations period triggered when Plaintiff was orally notified that he was being terminated, not when he received official notice of termination); Meyers v. IBM, Corp., 335 F. Supp. 2d 405, 410 (S.D.N.Y. 2004) ("employee receives definite notice [triggering the limitations period] when it is communicated to him that he will be terminated, not upon his discharge"); Haghpassand v. Reuters Consulting Group, No. 03 Civ. 5686 (LBS), 2004 WL 594576 (S.D.N.Y. Mar. 25, 2004) (limitations period triggered when plaintiff refused to sign resignation letter and was escorted off premises), aff'd, 120 Fed. Appx. 859 (2d Cir. 2005).

Thus, the day on which Plaintiff's termination from the school became effective is merely the date on which the "consequences of the past discrimination became most painful." Delaware State, 449 U. S. at 258, 101 S. Ct. at 504.  The termination letter of March 17, 2003 – which is the only event that could be used to save Plaintiff's claims – is, thus, irrelevant for purposes of the statute of limitations analysis because, as Plaintiff acknowledges, he had to be terminated once he was decertified.  The termination

was simply, even in Plaintiff's view, a necessary and inevitable consequence of the earlier acts of discrimination.   As a result, the March 17, 2003 letter did not commence a new charging period. See Ledbetter, 127 S. Ct. at 2169 ("a new violation does not occur, and a new charging period does not commence, upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from the past discrimination.").

*     *     *

In light of the foregoing, Plaintiff's discriminatory termination claim began to accrue as early as the middle of February, 2003, when Colonel Chianchetti notified him that he was going to be decertified, and continued until, at the absolute latest, March 5, 2003, when he was escorted off school premises and asked to turn in the keys to his office and desk.   Either of these two dates preceded by more than 300 days the date on which Plaintiff filed his EEOC charge – January 9, 2004.   Consequently, Plaintiff's claims under the ADA and ADEA are time-barred and are hereby dismissed with prejudice.[19]

---

[19] The Court rejects Plaintiff's argument that Defendants waived the right to argue that his claims are time-barred because they did not make such an argument before the EEOC.  Plaintiff submits no authority for this proposition, and it is wrong.  See, e.g., Cook v. Union Camp Corp., No. Civ. 95CV140SD, 1996 WL 407549 at *3 (N.D.Miss. Apr. 4, 1996) (defendant's failure to raise limitation defense before the EEOC did not waive its right to assert the defense in federal court); Byrnes v. Herion Inc., 757 F. Supp. 648, 653 (W.D.Pa.1990) (failure to raise limitations defense at EEOC level did not constitute waiver in federal court action). Moreover, Plaintiff is simply mistaken when he claims

IV.   <u>Plaintiff Also Fails To Establish A Prima Facie Case</u>

Plaintiff's discrimination claims are also deeply flawed on a substantive level because he has not provided competent evidence establishing a prima facie case of discrimination.

A.   <u>Legal Standard</u>

The standards for adjudicating an age or disability discrimination claim are well established and follow the burden shifting analysis first set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25 (1973) and <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53, 101 S. Ct. 1089, 1093 (1981).  <u>See also</u> <u>Sista v. CDC Ixis North America, Inc.</u>, 445 F.3d 161, 169 (2d Cir. 2006) (applying <u>McDonnell Douglas</u> in ADA discrimination case); <u>Stratton v. Dep't For The Aging</u>, 132 F.3d 869, 879 (2d Cir. 1997) (applying <u>McDonnell Douglas</u> in ADEA discrimination case).  "'First, the plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of discrimination.'" <u>Swierkiewicz v. Sorema N. A.</u>, 534 U.S. 506, 510-511, 122 S. Ct. 992, 997 (2002) (quoting <u>Burdine</u>, at 252-253, 101 S. Ct. at 1093); <u>see also</u> <u>Collins v. New York City Transit Auth.</u>, 305 F.3d 113, 118 (2d Cir. 2002);

---

that Defendants "failed to raise this feeble defense before this Court, in its Answer to the Amended Complaint."  (Response, at 9.)  Defendants Affirmative Defense No. 3 specifically states a statute of limitations defense.  (<u>See</u> Cresci Ver., Ex. B.)

Scaria v. Rubin, 117 F.3d 652, 653-654 (2d Cir. 1997).  However, the burden of establishing a prima facie case is not an onerous one, "and has frequently been described as minimal." Scaria, 117 F.3d at 654; Mandell v. County of Suffolk, 316 F.3d 368, 378 (2d Cir. 2003).  To establish a prima facie case of discriminatory disparate treatment, the plaintiff must show

> 1) that she belonged to a protected class; (2) that she was qualified for the position she held, or that she satisfactorily performed the duties required in her position; (3) that she suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.

Feingold, 366 F.3d 138, 152 (2d Cir. 2004); see also Collins, 305 F.3d at 118; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant, who must then show that "some legitimate, nondiscriminatory reason" exists for the alleged discriminatory actions. McDonnell-Douglas, 411 U.S. at 802, 93 S. Ct. at 1824; see also Feingold, 366 F.3d at 152.  The defendant need not prove by a preponderance of the evidence that the reasons for its actions were not discriminatory, since the burden of persuasion remains with the plaintiff throughout the case; the defendant must simply present clear and specific non-discriminatory reasons for its actions. See Burdine, 450 U.S. at 254-58, 101 S. Ct. at 1094-96.  If the defendant presents

legitimate reasons for its actions, the plaintiff must then be given an opportunity to demonstrate that the defendant's stated reasons are merely a pretext for discrimination. See <u>McDonnell-Douglas</u>, 411 U.S. at 804, 93 S. Ct. at 1825; <u>Burdine</u>, 450 U.S. at 253, 101 S. Ct. at 1093; <u>Patterson</u>, 375 F.3d at 221.  "If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.'" <u>Feingold</u>, 366 F.3d at 152 (quoting <u>Stern v. Trs. of Columbia Univ.</u>, 131 F.3d 305, 312 (2d Cir. 1997)).

B.   <u>Application</u>

_____The only alleged discriminatory act upon which Plaintiff seeks relief is his formal termination by letter of March 17, 2003. (<u>See</u> Pl.s' Mem. at 10 ("the March 17, 2003 date is the unlawful employment event from which Plaintiff complained")).[20]  Indeed, that is the only act for which he can seek relief in this action, as all other alleged acts of discrimination are time-barred.  For a variety of reasons, Plaintiff has not come close to establishing a prima facie case of discrimination with respect to his termination.

First, in light of Plaintiff's concession that he was no

---

[20] Plaintiff never disputes Defendants' assertion that allegations regarding events that occurred prior to March 15, 2003 are outside of the limitations period and time-barred.

longer qualified to teach as a JROTC instructor at Port Richmond once he was decertified by the Army, it becomes abundantly clear that Plaintiff has not satisfied the second prong of the prima facie test – "that he was qualified for the position." Feingold, 366 F.3d at 152.  Plaintiff was notified in mid-February that he was going to be decertified at the end of the month, and he was formally decertified by letter dated February 26, 2003, effective February 28, 2003.  Thus, as of February 28, 2003, Plaintiff was no longer qualified to teach JROTC at Port Richmond.

It is also evident that Plaintiff has offered no competent evidence that even suggests that the NYCDOE issued the March 17, 2003 letter of formal termination "under circumstances giving rise to an inference of discrimination." Feingold, 366 F.3d at 152. Plaintiff has not demonstrated, or even alleged, that he was treated differently than other JROTC instructors who had been decertified by the Army.  The Supreme Court's reasoning in Delaware State College applies with full force here:

> It appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure.  In order for the limitations period to commence with the date of discharge, [Plaintiff] would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure.  But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants. Rather, in accord with the College's practice, Ricks was offered a 1-year "terminal"

36

> contract, with explicit notice that his
> employment would end upon its expiration.

449 U.S. at 258, 101 S. Ct. at 504. This analysis squarely addresses and highlights why Plaintiff's reliance on the March 17, 2003 letter is misplaced. There is nothing about the issuance of the March 17, 2003 letter that gives rise to an inference of discrimination and, consequently, Plaintiff has also failed to meet the fourth prong of the prima facie test.

Although unnecessary for the disposition of this action, it is also clear that Plaintiff has failed to rebut Defendants' proffered legitimate, non-discriminatory reasons for their disciplinary letters to, and subsequent termination of, Plaintiff, so as to demonstrate that such justifications were mere pretexts for discrimination. Indeed, Plaintiff never denies that he committed the offenses which led to his decertification as an JROTC instructor. He used profanity to describe a member of the administration in front of his students, threatened to kill his supervisors in the presence of one of his colleagues, required two cadets to stick their heads in trash cans, failed to comply with school procedures for absences, and was found by his Army supervisor to have failed to properly supervise his students. The Army found that Plaintiff's inappropriate and unprofessional conduct rendered him unqualified to continue as an instructor. The same behavior, combined with his decertification as an instructor, clearly provided a legitimate basis for the NYCDOE to issue

37

warnings to Plaintiff and ultimately terminate his employment. Plaintiff has proffered no competent evidence, whatsoever, that suggests that Defendants' treatment of him was in any way related to either his age or purported disability.

V.   <u>COBRA Claim</u>

Plaintiff alleges a violation of COBRA on the grounds that Defendant NYCDOE failed to provide him with the required statutory notice that it intended to discontinue his health insurance benefits.  There is no merit to this claim.

Under the relevant COBRA notice provision, the NYCDOE was required to notify the group health plan's administrator of Plaintiff's termination within 30 days.  <u>See</u> 29 U.S.C. § 1166(a)(2).  The group administrator was then required to notify Plaintiff, within 14 days, of his right to continue coverage.  <u>See</u> 29 U.S.C. §1166(a)(4).  Defendants have submitted evidence that, on March 5, 2003 - the same day Plaintiff was escorted off school premises - Graham informed Cocozza, the payroll secretary, that Plaintiff had been terminated. (Diallo Aff. 1, Ex. X.)  Plaintiff does not dispute that this letter was sent, and that it was sent within the required timeframe under COBRA.  Plaintiff was formally terminated on March 17, 2003.  On March 26, 2003, Cocozza sent a letter to Plaintiff informing him that he could elect to receive COBRA coverage.  (<u>Id.</u>, Ex. BB.)  If sent, this letter complied with the relevant notice provision under COBRA.  Plaintiff does not

38

recall seeing the letter because he was in the hospital on March 26, 2003, but he admitted that his wife was collecting his mail during that time.   (See Liles Dep. 193:1-194:17.)   Moreover, Plaintiff produced the March 26, 2003 letter in response to Defendants' discovery requests and, when pressed during his deposition, eventually admitted that it must have been in his possession at some point.   (Id.)  A document is presumed to have been received within three days of its mailing.  Cf. Federal Rule of Civil Procedure 6(e) ("Rule 6(e)") (if service is mailed to last known address, recipient is given an additional three days to act); see also Baldwin County Welcome Center v. Brown, 446 U. S. 147, 148 n.1, 104 S. Ct. 1723 (1984) (citing Rule 6(e) for proposition that "presumed date of receipt" is three days after it was sent); Sherlock v. Montefiore Medical Center, 84 F.3d 522, 526 (2d Cir. 1996) (same).

In fact, Plaintiff has not submitted any competent evidence indicating that the March 26, 2003 notice was not sent to him on or about that date.   For example, Plaintiff did not submit an affidavit from his wife or his neighbor stating that the letter was not received shortly after it was sent.   See, e.g., Sherlock, 84 F.3d at 526 (three-day presumption can be rebutted with "sworn testimony or other admissible evidence").   Instead, he merely points to a subsequent COBRA notice form that was sent to his attorney by Port Richmond's Human Resources Department, on August

22, 2003, and argues rhetorically, "why would Ms. Fraser send the COBRA documentation in [sic] August 22, 2003, if it had been sent previously?" (Response, at 17-18; <u>see also</u> Cresci Ver., Ex. I.) The August 22, 2003 mailing, in response to what must have been Plaintiff's counsel's request, is not evidence that the March 26, 2003 letter was not sent to Plaintiff. To the contrary, the only admissible evidence in the record indicates that the March 26, 2003 letter was sent. (<u>See</u> Affidavit of Glenn Darien, attached as Ex. B to the Second Affidavit of Carolyn Walker Diallo ("Diallo Aff. 2"), at ¶ 6.) Simply because Plaintiff was in the hospital when the letter was delivered to his residence, does not create a genuine issue of fact as to whether Defendants satisfied their statutory obligation. It is not Defendants' obligation to track down Plaintiff in order to assure that he receives the COBRA forms that were sent to him. Plaintiff cannot state a claim under COBRA by merely claiming that he did not receive a letter that complied with the relevant notice provisions. Defendants are therefore entitled to summary judgment on the COBRA claim.

## CONCLUSION

For the reasons set forth above, this Court grants Defendants' motion for summary judgment and dismisses this action with prejudice.

So Ordered.

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: September 27, 2007
       New York, New York